Ms. Ellsworth. Good morning, Your Honors. Jessica Ellsworth on behalf of the appellant. Your Honors, this is not a typical obviousness case. In the typical obviousness case, all of the claim limitations can be found somewhere in the prior art. And the court's task is to determine whether there is a motivation to combine those elements and a reasonable success of doing so. But here you have all the same elements, isn't that 323 patent prior art? Absolutely, the 323 patent. And it involves taking a pen M and a base and combining it with a CO2 course, a source. And the 323 does the same thing. It's got a pen M and a base providing CO2. Your Honor, there are some very specific differences between the patents that I think are important. The first is that if you view the patents as a whole, they are solving a different problem. In the 323 patent, the question was how to solve a particular instability that the erdapenem molecule has. And that's the instability at the pyrrolidine nitrogen atom. You can see this because the 323 patent and the Almersen reference both define stabilized form as involving that pyrrolidine nitrogen atom. But this solution is described as if it were known to the inventors at the time and published. The solution in the 150 patent was not known to the inventors at the earlier time. And the key point is that the 150 patent provides a means of having long-term stability. It solves not just the problem of dimerization, which is the instability at that pyrrolidine nitrogen atom, but it also solves a separate degradation. And that's open ring degradation, which occurs through hydrolysis. Doesn't the 323 patent describe putting a boxing group on the pyrrolidine ring? And isn't that what the 150 patent does? That is one aspect of what the 150 patent does. One aspect? What's the key aspect? With all due respect, Your Honor, it's not. The 150 patent is a manufacturing process to get to a final formulation product. And a final formulation product requires solving not just dimerization, but also open ring degradation, which is a significant problem. Open ring degradation was something that was known in the prior art to affect all beta lactams. And the prior art, in fact, taught away from using this pH of 6 to 9 when dealing with beta lactams. You can see this in the District Court's decision when it found that the 323 patent wasn't obvious over the prior 820 patent. One of the reasons it found that lack of obviousness was because for beta lactams, the prior art taught to use a pH of 3.5 to 5 in order to find the maximum stability against hydrolysis. But the 323 taught the 6 to 9 ratio, didn't it? The 323 taught the 6 to 9 ratio only in connection with dimerization. It defined stabilized form of ertapenem as only dealing with dimerization. The 150 patent took on a bigger problem. It was not about short-term stability. It was not about just solving the problem of how to form the adduct. It was about how to have a manufacturing process that would simultaneously protect ertapenem against both dimerization and also open ring degradation. That is not in the claims. What is in claim 21 of 150 are the procedural steps of adding the penem and base to a carbon dioxide source and then lyophilizing. Your Honor, as the District Court noted at appendix page 41, the steps set out in the 150 patent are not in the prior art. And there are a few specific ways that I would point out to this Court that there are differences. The 150 patent, as you noted, starts by charging a solution of carbon dioxide source. Nothing in the 323 patent spoke to starting with a carbon dioxide source and solution. The second thing is that step 2 in the 150 patent speaks to adding a base and an active ingredient simultaneously. As the District Court recognized at appendix page 39, there is nothing in the 323 patent that talks about the simultaneous addition. The only thing that the District Court relied on in looking at the 150 patent and looking at these steps was Dr. Murgatroyd's hindsight testimony. And we know that that's hindsight testimony for a couple of reasons. It is not rooted in any prior art, the suggestion to start with the carbon dioxide source to simultaneously add the base and the active ingredient. Dr. Murgatroyd, Hespera's expert, simply said that was what he would do without any These aren't reasonable variations permissible by and known to one of still in the art? We don't think they are, Your Honor. And there are a couple reasons for this. This Court has specifically offered some caveats on when it is appropriate for a court to use common sense or common knowledge in the art to impose or find claim limitations, missing claim limitations, in an obviousness analysis. And I would direct the Court specifically to the Arendi v. Apple case from last year, which the Court said there are three caveats. The first is that supplying a missing claim limitation, excuse me, the motivation to combine is generally about taking limitations that exist and combining them. It is not about supplying missing claim limitations. The second is that it is an exception rather than a rule to be able to say common knowledge provides a missing claim limitation. And the third is that a missing claim limitation should not be supplied through common knowledge where it plays a major role in the subject matter claimed. To our knowledge, there is only one case in which this Court has ever allowed common sense or common knowledge to supply a missing claim limitation, and that was the Perfect Web case, in which the patent involved very simple technology and the missing limitation did not play a major role in that technology. The Here Where case, which was cited in Arendi, even invokes that when a claim is before a patent examiner, the MPEP specifies that a patent examiner can only rely on common knowledge to support a rejection in very narrow circumstances. And those circumstances are where there is a basis in the prior art, where the facts are, quote, capable of instant and unquestionable demonstration of being well-known. Now that's before the patent examiner. Here we have a patent in which Hospira was invoking two prior art patents, both of which were before the examiner at the time the 150 patent was issued. So not only do we have the presumption that the 150 patent is valid, but that's an enhanced burden that Hospira faced, given that these two prior art references were, in fact, both before the patent examiner. So the district court erred in a couple of different ways. We've been talking about the use of common sense. The other, I think, clear error was the use of the 150 patent as a template. Rather than starting with a 323 patent and saying, what would this make obvious to a practitioner, a skilled practitioner at the time of 2001, the district court started with the three process steps, broke them up into subparts and said, well, here's what subpart one says. Can I find anything that might have suggested you would go to subpart one? Then we moved to part two. Can I find anything that suggests you might have gone next to step two? But that's not the way the analysis is supposed to work. Doesn't the 323 patent describe a process for putting a carboxy group on the parole ring of this pin-in? It does, Your Honor. But that is not all. And isn't that what the 150 patent does? That is one aspect of what the 150. One aspect of it. Isn't that basically what's in the claim? I think, Your Honor, if you look at the fact that claim three, the introduction to claim 21 and claim three both talk about a final formulation product, and the district court's Markman definition of final formulation product was that a final formulation product was one that had low byproducts. And low byproducts include dimers and open ring degradants. So the 150 patent took what was in the 323 patent and took it significantly further. And it did that by finding what was really an unexpected result, which is that there was a way to resolve open ring degradation in a different pH range than the prior art had taught was the range that should be targeted for beta-lactams. The district court at Appendix 12, you can see the district court speaks specifically to the fact that beta-lactams were known in the prior art to have maximum stability in the range of 3.5 to 5. And the district court, in fact, used that as part of its reasoning in why the 323 patent was not obvious by pointing out that people trying to turn erdapenem into a pharmaceutical product would have been working in the 3.5 to 5 pH range in order to deal with a known hydrolysis problem. At the time the 150 patent was filed, that means that the prior art taught two things and it didn't teach one thing that are very critical to analyzing the 150 patent. It taught that you could form an adduct in the pH range of 6 to 9. The prior art taught that to have maximum stability of beta-lactams, you wanted to be in a range of 3.5 to 5. Now, of course, those two ranges cannot be simultaneously reached. And what it didn't teach was that within the range of 6 to 9, there was this divergent effect of pH on dimerization and open ring degradation. So the 150 patent not only solved the open ring degradation problem, but it also provided a solution to this previously undisclosed and unknown problem of how to deal with the divergent pH effect. Does the district court make any errors of law or any clearly erroneous fact findings? We have challenged primarily the legal errors that affected the district court's analysis and that includes not considering the patent as a whole. And to be clear again, the patent as a whole is not just a manufacturing process for forming the adduct. That is what Hospira argues. It's what led Hospira to encourage the district court to view the 323 patent as a recipe. But, of course, you can't have a recipe for something that doesn't tell you what you're making. And the 150 patent made something different. It made an ertapenem product, a final formulation product, that had two plus years of stability. It took something that previously had stability. The stability data from the 323 and the Elmerson was in terms of hours and days. The 150 process, through that very specific manufacturing process, again with steps that are not set forth, there's nothing that speaks to starting with a C of carbon dioxide source and then simultaneously adding the base and the active ingredient at the same time. It was able to come up, Merck was able to come up with a manufacturing process that solved open ring degradation sufficient to have long term stability and therefore be able to have what really could then become a commercially available product on a hospital shelf. If I could just mention one other thing. The unexpected results are a critical aspect here of showing non-obviousness. And the district court failed to mention or address Merck's argument on unexpected results, which was made. That, again, is a legal error. This court has required district courts to address the objective indicia of non-obviousness before reaching an obviousness conclusion. And here the district court did not do so. I think one of the quotes that really highlights this is that the district court... What the district court said in terms of secondary indicia were contributed by the molecule itself, which was described in the 323 patent, right? The district court addressed, in talking about the 150 patent, the district court addressed copying, which it found Hospira had copied the manufacturing process. There was no question about that. It addressed commercial success, and it did not address unexpected results. That was something that Merck had briefed in its post-trial brief, were these unexpected results, particularly on the open ring degradation problem and the divergent pH effect, which were not something that were previously discussed or described, or that there was any suggestion in the prior art that a pH range of 6 to 9 would do anything to resolve. If I could reserve the remainder of my time for rebuttal. Okay, we'll save your full rebuttal time, Ms. Ellsworth. Let's hear from Mr. Maloro. Thank you, Your Honor. May it please the court. The district court appropriately ruled that the 150 patent would have been obvious because the 323 patent arms the person of ordinary skill in the art with the information that they need to practice and arrive at the 150 patent claims. The 323 patent teaches that ertapenem is a carbapenem antibiotic. It provides the structure for that molecule. It provides the stabilization of ertapenem, critically by reacting at that pyrrolidine nitrogen with a carbon dioxide source to stabilize the ertapenem molecule. It also teaches that the pH range of 6 to 9 is the pH range to use. But it doesn't discuss the particular order of addition and the details, the fine points which we're told make the difference between success and failure. Two aspects to that question, Your Honor. The order of addition doesn't make the difference between success or failure. It's the reaction of that carbon dioxide source in the pH range of 6 to 9 and then lyophilization. That's what gets you success. All of that is in the 323 patent. The 323 patent specifically says to lyophilize. With respect to the specific order of addition of the ingredients, essentially the 150 patent claim tells you that you bring together your carbon dioxide source with your ertapenem and you lyophilize. One of ordinary skill in the art would understand that you want to be operating in that pH range of 6 to 9. That's what's in the 323 patent. That's what's in the 150 patent. That gives you information, if you're one of ordinary skill in the art, about how you bring these ingredients together. So Dr. Murgatroyd testified that one skilled in the art would know that you would first dissolve your carbon dioxide source because you have essentially a finite number of choices here. You can put all of your ingredients in together at once or you can put one into solution and then the active into solution. One of ordinary skill in the art, Dr. Murgatroyd testified, Dr. Staley confirmed as a matter of chemistry, and Judge Andrews found, would understand that ertapenem having a pH below 6, you would want to have that present with a base, sodium hydroxide, to counteract the pH of the ertapenem. So you would be within that maintained range of 6 to 9, the range that 323 teaches. Dr. Murgatroyd explained that and Judge Andrews found that. Judge Andrews also understood from the testimony that you would not combine all three components together. Even Dr. Staley, Merck's expert, said that as a matter of chemistry, if you added all three components together, one skilled in the art would understand you'd have uncontrolled reactions. One skilled in the art exercising the ordinary creativity. What about unexpected results which your opposing counsel said the court didn't deal with, avoidance of dimerization and hydrolysis? There is no unexpected result that is not accounted for totally by the 323 patent. The result of stability is taught in the 323 patent as a result of operating to form that adduct in the pH range of 6 to 9. And in fact, Dr. Stella... In other words, putting the hydroxide group on the pyrolidine produces the results. ...in that pH range of 6 to 9 taught by 323. Dr. Stella himself, Merck's expert, testified with respect to the 323 patent that the 323 patent taught what he called a sweet spot. A sweet spot between preventing dimerization and also minimizing this ring-opening hydrolysis. And that's at page A1040. That was with respect to the 323 patent. Dr. Williams, one of the inventors on the 150 patent, confirmed that it was known that carbapenems, like ertapenem, known in the art, were unstable hydrolytically at low pHs and high pHs. The unexpected result that counsel is arguing here is the unexpected result, if there is any, of following the 323 patent. Bringing together the carbon dioxide source with the ertapenem in the sweet spot pH range of 6 to 9. There's nothing else claimed in the claims of 150 leading to an unexpected result. There's nothing else alleged to provide some unexpected property. Dr. Stella testified that the 323 patent doesn't just teach an adduct, it teaches a pharmaceutical composition sufficiently stable that it can be suitable for intravenous administration to humans. The 323 patent gives you a pharmaceutical that can be put on the shelf. The 150 patent adds nothing in that regard. The 150 patent has no claim to two years of stability, but even if there were some level of stability achieved, that level of stability is achieved following the 323 patent. Forming the adduct in the pH range of 6 to 9. These were Merck's own experts who provided this supporting testimony. Dr. Stella is an eminent researcher. At trial, he testified to having invented several pharmaceutical products that have been approved by the FDA and are out in the field. And he said the 323 patent, when you follow it, gives you a pharmaceutical composition suitable for administration, intravenous administration to humans. Now, with respect to the expert testimony of Dr. Murgatroyd, Dr. Murgatroyd is an eminent practitioner in the field of lyophilization. He has decades of experience in the field. The expert from Merck, Dr. Staley, who was the primary expert on the validity of the 150 patent, admitted he has nowhere near the expertise of Dr. Murgatroyd when it comes to creating processes for lyophilizing pharmaceuticals. These aren't people of ordinary skill. These are people of superior skill. Dr. Murgatroyd... You might read the 323 and understand some things that the ordinary person might not. It is correct that Dr. Murgatroyd is an expert in the field and Dr. Staley was accepted as an expert. And what Dr. Murgatroyd explained was what a person of ordinary skill in the art would know, not what only an expert would know. These were matters of routine chemistry. When reading the 323 patent, the 323 patent specifically taught that chemical reaction at the pyrrolidine nitrogen. One of ordinary skill in the art would understand that. One of ordinary skill in the art would understand the pH range of 6 to 9. So the experts were not providing expert testimony only known to experts. They were simply explaining, Dr. Murgatroyd was explaining what was in the 323 patent itself. Judge Andrews was well within his discretion in adopting Dr. Murgatroyd's testimony, much of which was confirmed by Dr. Stella or Dr. Williams or in some instances Dr. Staley. And none of the factual findings were clearly erroneous. But we're told also that it took quite some time before this inherently unstable compound was developed and a method of doing so was recognized. So are we not just imposing our own hindsight based on what finally worked? I saw some reference to an argument of that nature in Merck's brief. And just while patentability is not negatived by the manner in which the invention is made, I think it was the Merck v. BioCraft case that said, neither does the fact that it takes the inventors a little bit of time to do their work makes it patentable in and of itself. One must look at what is known in the prior art and whether the differences would have been obvious to one of ordinary skill. Here, the 3-2-3 patent, which took some years after the invention of ertapenem, arms the person of ordinary skill in the art with the information that they need in order to make a lyophilized ertapenem adduct with that carbon dioxide. Was the 3-2-3 patent upheld? The 3-2-3 patent was upheld at trial in the same trial as the 150 patent. Was there an earlier patent on the penam that expired? That's correct, Your Honor. There was a patent called the 8-20 patent, which claimed ertapenem itself, the molecule. That patent was not challenged. The 3-2-3 patent claimed the ertapenem adduct and had pharmaceutical compositions suitable for intravenous administration. That patent was challenged at trial. Based on the 8-20 patent and knowledge of one of skill in the art, Judge Andrews upheld the validity of the 3-2-3 patent. It was only the 150 patent, which is the simple lyophilization process, that Judge Andrews found would have been obvious based on 3-2-3. Well, it's more than lyophilization. It was a little reversal of the process, two-step process for putting on the carbon dioxide. The process for putting on the carbon dioxide is the same. It's exposing the carbon dioxide source to the ertapenem in solution. And that happens in the 3-2-3 patent. It happens in 150. 150 has the steps of first adding the carbon dioxide to solution, then adding the ertapenem with the base. One of ordinary skill in the art would have been motivated to take those steps based on the chemistry that was undisputed amongst the experts. Dr. Murgatroyd testified why one of skill in the art would have done it in that fashion. Dr. Staley confirmed, and Judge Andrews found that one skilled in the art would have known there were problems if you tried to do things a different way, like adding all three of the components at the same time. 3-2-3 arms one skilled in the art with the information they need. Judge Andrews properly found the facts, properly concluded that the 150 patent is obvious. There are no further questions. Okay. Thank you, Mr. Monroe. Thank you, Your Honor. Ms. Ellsworth. Your Honor, frankly, the 3-2-3 patent doesn't arm someone with what they need. It speaks about blending a powder of carbon dioxide source and ertapenem, and then it speaks about using a base at some later point upon dilution to give it to a patient or upon reconstitution. That is very different from the manufacturing steps set out in the 150 patent. And Dr. Murgatroyd, Hospira's expert, acknowledged that at pages 658, 673, 748, and 749 of the appendix, that those manufacturing steps were not set out. What he offered instead was his own say-so, that that's what he would have done. But that say-so was not rooted in any prior art. It wasn't rooted in anything that would give the factual underpinning that this Court has said is required to find that an expert's testimony has the sufficient protections against hindsight bias. Counsel for the other side suggested that there's nothing in the 150 patent that relates to two years of stability. With all due respect, I disagree. If you look at column 9 of the 150 patent, lines 1 to 9, there is a definition for solid state stability. This is the specific shortcoming that the 150 patent sets out as missing from the 323 patent and Olmerson. There's no way to take what's in the 323 and Olmerson and end up with solid state stability and reconstitution stability. That is what the 150 patent added to the knowledge at the time. The patent examiner who had the 323 and Olmerson in front of him when he issued the 150 patent certainly could have looked at those and did not think that they armed someone with what they would need. The main difference here is, yes, the 323 gets you a pharmaceutical composition, but it's a pharmaceutical composition that degrades in a matter of hours. So if you're making it in a lab and you have a patient right next door who you can run across the street and administer it to through an IV... Even with the CO2 molecule? Yes, Your Honor. On the nitrogen, it degrades? That's correct, Your Honor. The only stability... Is that because it wasn't flyophilized? No, Your Honor. It's because it didn't prevent the open ring degradation. It's because the only stability was on that pyrrolidine nitrogen atom. It wasn't also on the beta-lactam ring. In order to get stability on the beta-lactam ring, you have to follow the specific steps in the specific order that are set out in the 150 patent. So what the 150 patent does is give a way to have a simultaneous reduction of both dimers and open ring degradants so that you can get that two years of solid-state stability that the 150 patent spells out in its definitions, again, at column 9, lines 1 through 9. Most of your friends as a person of ordinary skill would know that you have to preserve the pH in that range. And the way to do that is to do it the way the 150 does it. What's the answer? So there are a number of answers to that. One is that they don't point to any prior art that suggests that to be true. They are relying simply on common sense. And that reliance on common sense conflicts with what this Court has said about the appropriate use of common sense to fill in missing claim limitations in both the Arendi and the Hareware case. The other problem with it is that it conflicts with the prior art and what it taught about beta-lactams, which were that to treat beta-lactams in a way that would give them maximum stability, you had to be at a different pH range from what Dr. Murgatroyd was saying. Somehow it would be obvious to have been using to solve hydrolysis in the patent process set out in the 150. And again, there's no basis for doing that. Your Honor pointed out that it had taken five years to get from the 323 patent to the 150 patent. The process manual that's in the Joint Appendix spells out all of the significant work that was done during that year, including, importantly, moving from what's in the 323 patent, this blending of powder form, of ertapenem and a carbon dioxide source, and instead moving to a situation where they started with carbon dioxide source, dissolved in a solution, and only then thought to add in the ertapenem, the active ingredient, along with the base, simultaneously. Neither of those steps are set out or suggested anywhere in the 323 patent. And by not starting with the 323 patent and saying what would be obvious from there, forward-looking, the district court really engaged in the type of hindsight analysis that this court has consistently said is improper. You can't start with what's in the 150 patent and look backwards. But that's what the district court did, that's what Dr. Murgatroyd did, and with all due respect, that is a legal error that is one of the many legal errors in this case that warrant reversal. If the court has no further questions, we respectfully ask that you reverse the district court's decision. Thank you. Thank you both. The case is taken under submission. That concludes this morning's arguments. All rise.